# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

**NORMIA CABILOCAN SULAIMAN and
MOHARIA SAWMANG CABILOCAN,**

Plaintiffs,

    **-against-**

**YOUSEF LARAM and MIRIAM LARAM,**

Defendants.

Case No. 1:16-cv-8182-CM

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS, OR, IN THE ALTERNATIVE, FOR A MORE DEFINITE STATEMENT, AND MOTION TO STRIKE

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS, OR, IN THE ALTERNATIVE, FOR A MORE DEFINITE STATEMENT, AND MOTION TO STRIKE**

## TABLE OF CONTENTS

TABLE OF CONTENTS ……………………………………………………......i

TABLE OF AUTHORITIES …………………………………………………………ii

PRELIMINARY STATEMENT …………………………………………………..1

STATEMENT OF FACTS …………………………….…………………………2

ARGUMENT …………………………………………………………………6

    I.   Claims for Relief Should Be Dismissed or Ordered More Clearly Pleaded…………7

        a.   "First Claim for Relief," "Second Claim for Relief," and "Third Claim for Relief": Trafficking Victims Protection Act Claims …………………………9

        b.   Fourth Claim for Relief: Fair Labor Standards Act Claim…………………11

        c.   "Fifth Claim for Relief," "Sixth Claim for Relief," "Seventh Claim for Relief," and "Eighth Claim for Relief": New York State Labor Law Claims.12

        d.   "Ninth Claim for Relief": Breach of Contract ………………………………13

        e.   "Tenth Claim for Relief": Quantum Meruit Claim …………………………14

        f.   "Eleventh Claim for Relief": Fraud ………………………………………15

        g.   "Twelfth Claim for Relief": Conversion ……………………………………20

        h.   "Thirteenth Claim for Relief": Intentional Infliction of Emotional Distress...21

    II.   Several Statements in the Complaint Should Be Made More Definite, or Stricken as Immaterial and Scandalous

        a.   ¶¶ 11-12, 25…………………………………………………………22

        b.   ¶¶ 15-16, 26-27, 33 ………………………………………………………23

        c.   ¶¶ 20, 29, 31, 32, 35 ……………………………………………………24

CONCLUSION ………………………………………………………………………….25

## **TABLE OF AUTHORITIES**

PAGE

CASES

Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514 (2002) ………………………………………..8

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) …………..……….................................................8

Walia v. Veritas Healthcare Solutions, LLC, No. 13 Civ. 6935 (KPF), 2015 WL 4743542, at *3 (S.D.N.Y. 2015) …………………………………………………………………………..8

In re Fosamax Prods. Liab. Litig., No. 06 MD 1789 (JFK), 2013 WL 6669706, at *2 (S.D.N.Y., Dec. 18, 2013) ……………………………………………………………………………8

Pelman v. McDonald's Corp., 396 F. Supp. 2d 439, 442 (S.D.N.Y. 2005)……………....……..8

Kelly v. L.L. Cool J., 145 F.R.D. 32, 36-37 (S.D.N.Y. 1992) ………………………………..…..8

Resolution Trust Corp. v. 260-68 Elizabeth St. Owners Assocs., No. 92 Civ. 4756 (SWK), 1997 WL 202109, at *5 (S.D.N.Y., Apr. 24, 1997)…………………………………………………..8

Kelly v. L.L. Cool J., 145 F.R.D. 32, 36-37 (S.D.N.Y. 1992)…………………………………….9

Resolution Trust Corp. v. 260-68 Elizabeth St. Owners Assocs., No. 92 Civ. 4756 (SWK), 1997 WL 202109, at *5 (S.D.N.Y., Apr. 24, 1997)…………………………………………………..9

Kiobel v. Royal Dutch Shell Petro. Co., __ U.S. __, 133 S.Ct. 1659, 1663-64 (2013)………….10

Monaco v. Carpinello, No. CV-98-3386 (CPS), 2004 WL 3090598, at *9 (E.D.N.Y., July 19, 2004) ………………………………………………………………………………………..15

Tanzman v. La Pietra, 8 A.D.3d 706, 778 (N.Y. App. Div., 3d Dep't 2004)…………………….15

Cromer Fin. v. Berger, 137 F. Supp. 2d 452, 468 (S.D.N.Y. 2001)……………………………...16

In re Methyl Tertiary Butyl Ether Prods. Liab. Litig., 379 F. Supp.2d 348, 369 (S.D.N.Y.2005)16

Telecom Int'l Am., Ltd. v. AT&T Corp., 280 F.3d 175, 196 (2d Cir. 2001) …………………....17

PAGE

CASE

Continental Petroleum Corp. v. Corp. Funding Partners, LLC, No. 11 Civ. 7801 (PAE), 2012
WL 1231775, at *10 (S.D.N.Y. Apr. 11, 2012)……………………………………………17

Lipsky v. Commonwealth United Corp., 551 F.2d 887, 893 (2d Cir. 1976)……………………24

Roe v. City of N.Y, 151 F. Supp. 2d 495, 510 (S.D.N.Y. 2001)………………………………...24


STATUTES

18 U.S.C. §§ 1589 et seq …………………………………………………………………………9

18 U.S.C. §§ 1590 & 1595..………………………………………………………………….... 9

18 U.S.C. § 1592………………..…………………………………………………………………...9

133 S.Ct. 1659, 1663-64 ………………………………………………………………………...10

18 U.S.C. § 1596(a)(1)……………………………………………………………………...…10

18 U.S.C. § 1596(a)(2)………………………………………………………………………...10

29 U.S.C. §§ 201 et seq ………………………………………………………………………11

29 U.S.C. § 255(a) ……………………………………………………………………………11

N.Y. C.P.L.R. ¶ 214 …………………………………………………………………………..20

N.Y. C.P.L.R. § 215(3) ………………………………………………………………………21

N.Y. C.P.L.R. §214(4); 75A N.Y …………………………………………………………21

N.Y. C.P.L.R. §215 …………………………………………………………………………21


OTHER

Rule 8(a) of the Federal Rules of Civil Procedure …………………………………………...7, 23

Rule 12(e) …………………………………………………………………………………....7, 8

Rule 12(b) …………………………………………………………………………………....7

Federal Rule of Civil Procedure 10(b) ………………………………………………………7, 8

Rule 9(b)…………………………………………………………………………………………15

Fed.R.Civ.P. 9(f) ………………………………………………………………………………...15

## PRELIMINARY STATEMENT

The plaintiffs have failed to plead their claims, recited in fourteen counts of the October 19, 2016, Complaint, so that the defendants can have notice of their bases.  Instead, the Complaint takes a shotgun approach, alleging conduct and transactions taking place over six or seven years, ranging over three continents.  The defendants are left to speculate about which allegations are intended to support which claims, and which allegations are advanced for other reasons, making it difficult to answer the Complaint in good faith without risk of prejudice.  Furthermore, several critical facts, including transactions that give rise to claims of fraud ("Eleventh Claim for Relief"), are not pled with requisite particularity.  Other claims, regardless of their grounds, such as the intentional infliction of emotional distress claim ("Thirteenth Claim for Relief"), should be dismissed outright.  For all claims, the underlying grounds are just alluded to in general terms.  Finally, the Complaint recites immaterial and scandalous matters, which have no relevance to any claims, and such statements should be stricken.

## STATEMENT OF FACTS

The Complaint alleges that plaintiff Normia Sulaiman (Sulaiman) was employed by the defendants in Qatar in 2009 "as a housekeeper and nanny" in Qatar, and that she worked for the defendants and their family in various capacities, in both Qatar and New York, until 2015.  (¶¶7, 35) The Complaint does not say, but one infers, that she was initially retained by an employment agency in the Philippines, which is not before the Court.  (¶ 11)

Several years later, plaintiff Moharia Cabilocan (Cabilocan) was hired by an agency in the Philippines, started working as a domestic worker in Qatar, and later went to New York City to work for the defendants. (¶¶ 25, 35) She worked for the defendants briefly.  While it appears that plaintiff Cabilocan was recruited by an agency in the Philippines, the Complaint suggests

1

that plaintiff Sulaiman persuaded her to apply to work for the defendants; by this time Ms. Sulaiman had already worked for the defendants for years.  (¶¶ 24, 25)

The Complaint names two defendants, Yousef and Miriam Laram, residents and nationals of Qatar, who lived in New York City while Mr. Laram worked at the United Nations.  They live with their extended family in Qatar.   At points, the Complaint takes advantage of this fact to blur the distinction between, on one hand, allegations of conduct by the defendants themselves, and, on the other hand, allegations of conduct by others not before the Court, including "family members of the Larams" (¶¶ 25). The family is alleged to live in a "compound residence with multiple buildings on a single property." (¶ 10) According to the Complaint, both plaintiffs worked for members of the defendants' extended "family" (¶¶ 11, 12).  For example, according to the Complaint, Sulaiman maintains that she feared "severe consequences for disobeying the wishes of the Defendants." (¶ 11) The basis of this fear, however, was the alleged disciplinary action taken against another domestic worker who worked in the family "compound," who was fired "for speaking on a cell phone" (it is not clear whose cell phone she was using) and for "seeing men on the compound in violation of house rules." (¶ 11) Allegedly, this worker was dismissed and given an airline ticket back to the Philippines.  The episode is attributed to the "Defendants" in the Complaint, but it was the defendants' "family" (not, apparently, the defendants themselves) who had "blacklisted [the ex-employee] from all domestic worker agencies in the Philippines."  (¶ 11) Further on, the Complaint explains that it was the "employment agencies in Philippines [sic]"—not the employer or employer's family—that do this supposed "blacklisting." (¶ 61))

Later, according to the Complaint, plaintiff Sulaiman, was "reminded" of what had happened to this other employee, allegedly "as a means of intimidating Ms. Sulaiman" (¶ 11),

and this made Sulaiman "frightened." (¶ 12) The Complaint is indefinite, however, about where this "reminder" occurred, or, indeed, what the defendant is supposed to have said to her. (¶ 11) From this experience, however, Ms. Sulaiman allegedly felt "compelled to comply with the Laram family demands"—but what these "demands" were, when they were made, and where they were delivered, is not alleged. (¶¶ 11-12) In both Qatar and the United States, she alleges, she was underpaid and worked long hours. (¶¶ 12-13)

Plaintiff Sulaiman recruited Cabilocan to come to work with her in New York City at the defendants' home. (¶ 24) Plaintiff Cabilocan alleged that she was also "mistreated and threatened" by members of "the Laram family." (¶ 25) She also claims she witnessed another employee's dismissal and eviction by other members of the defendants' family (not by the defendants). (¶ 25)

According to the Complaint, the defendants "confiscated" the plaintiffs' passports. (¶¶ 19, 30) They allege that they lived in a "pantry" (¶¶ 20, 29) and that they were given unpalatable or inedible food. (¶¶ 20, 29) The Complaint alleges that they were "slapped" by one of the defendants and called "slave" or "animal" (though it is unclear from the Complaint where or when these incidents occurred). (¶¶ 20, 29) The plaintiffs claim to have worked long hours and been paid at a rate below the rate stipulated in their contracts. (¶¶ 18, 29) (One of these contracts, however, is attached to the Complaint as Exhibit A, but it is dated two years after the contract described in the Complaint.)  They also claim that they were "kept locked in the apartment" (¶ 29), and that Ms. Sulaiman was not given a key. (¶ 21)

The Complaint's narrative section suggests the possibility that parts of the alleged conduct occurred in Qatar, and that they were hired in the Philippines. (¶¶ 11-12, 61) The

plaintiffs worked for defendants and family in Qatar, as well as in New York. The circumstances of how Ms. Sulaiman initially made contact and was hired is not explained.  (From the Complaint, one infers that the initial contact with Ms. Cabilocan was made by Ms. Sulaiman herself (¶ 24); the subsequent hiring process, however, is obscure.)  The circumstances of their initial employment are not explained.  Both, however, apparently depended on employment agencies in the Philippines to obtain work; and both assert that they greatly feared "blacklisting" by these same agencies. (¶¶ 11-12, 30) As stated, at critical points, the Complaint is vague about whether the two <u>defendants</u> actually engaged in the alleged conduct, or whether the acts were done by others.  There is no allegation, however, that either plaintiff was ever actually "blacklisted" by anyone.

Other averments contribute to this general blurring of the allegations. Much of the Complaint is based "on information and belief," rather than on actual knowledge.  Included in this category are: the allegation the defendants fraudulently signed a contract and submitted it to the U.S. government (¶¶ 16, 27); the allegation that one defendant made an "especially shocking" "hypocritical[]" speech before the United Nations (¶ 31); an allegation about the defendants' understanding of what the law required (on which turns the allegation that Ms. Sulaiman's vacations were grudgingly rather than gladly allowed) (¶ 33); the allegation that defendants threatened the plaintiffs and their families (¶ 36) ; and allegations about whether the defendants maintained certain records (¶ 48).  In the same vein, the plaintiffs attach two contracts which they say are "similar" to contracts concluded with the defendants when they started their employment. (¶¶ 15, 26) They do not indicate specifically which contract (or contracts) the defendants allegedly submitted to the U.S. Embassy in Qatar, but instead ones that are "similar" in the Complaint.   (¶¶ 15, 26)

Several other shotgun allegations really amount to little more than an effusion of moral outrage against the defendants.  For example, the Complaint calls one defendant a "hypocrit[e]" because he delivered a speech condemning slavery and human trafficking at the United Nations. Furthermore, it further editorializes that his supposed hypocrisy was "especially shocking." (Id. ¶ 31) Elsewhere, the plaintiffs condemn their alleged treatment and conditions as "patently unreasonable," "appalling and inhumane," "abominable," as so on. (¶¶ 3, 12, 20, 24-26, 29)

From the conduct alleged, it is nearly impossible to discern which alleged acts and omissions are actionable.  For example, the plaintiffs allege that the "front door" to the New York apartment where the plaintiffs worked "was always locked" (¶ 21)—New York City apartment dwellers will understand that this is not an unusual situation. When they did decide to leave the defendants' employment, however, the plaintiffs aver that they could leave out the front door with their luggage.  (¶ 35)

Indeed, plaintiff Sulaiman was apparently free to periodically return to the Philippines; indeed, shortly before her "escape" from the defendants' household, she took a trip back to the Philippines to visit her family, and then she returned to defendants' apartment in New York. (¶ 33) This seems a bizarre thing to do if, since 2009, conditions with the Laram family were as "frighten[ing]," "appalling," "abominable" or "patently unreasonable" as she now depicts them to have been.  (¶¶ 24, 25) In fact, according to the Complaint, Ms. Sulaiman went back to the Philippines for extended stays every two years.  (¶ 33) (The Complaint depicts even this as further illustration of the defendants' allegedly peremptory conduct: "Every two years the Defendants required [sic] her to return to the Philippines to renew her employment contract." (¶ 33)) During these stays with family in the Philippines, she renewed her employment with the defendants with a new two-year contract (¶ 33)—another seemingly bizarre act, if the defendants

had breached their prior contract, which allegedly had been fraudulently offered both to the plaintiffs and to the U.S. Embassy in Qatar.

The Complaint makes fourteen "Claims for Relief."  (¶¶ 52-145) As described in the "Argument" section, these claims are vague about times and places where the conduct is alleged, and about which acts or omissions are alleged to have been committed by the defendants (as opposed to acts by others not before the Court).  Many of the claims seem to be for conduct beyond the Court's jurisdiction; either the acts alleged actually occurred outside the Court's geographical jurisdiction, or outside the limitations periods of the causes of action.

## ARGUMENT

### I.   The "Claims for Relief Should Be Dismissed or Ordered More Clearly Pleaded.

Rule 8(a) of the Federal Rules of Civil Procedure requires a complaint to have three elements: "(1) a short and plain statement of the grounds for the court's jurisdiction . . . ; (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and (3) a demand for the relief sought . . . ."

Rule 12(e) provides for motions for more definite statement where a pleading "is so vague that the party cannot reasonably prepare a response."  The Complaint's fourteen "Claims for Relief" do not identify the acts or omissions upon which they are premised.  For most, it is not possible for the defendants to formulate their responses, whether in the form of a Rule 12(b) motion or in an answer.  The claims are unclear about whether the underlying acts occurred in Qatar, or in the Philippines, or in the United States.  They are also nebulous about when these claims arose.  They are also vague about who actually committed several of the critical acts or omissions.  Much of the alleged conduct is attributed to members of the defendants' "family," but it is not clear whether the defendants did anything.

Federal Rule of Civil Procedure 10(b) requires that, for each claim, "each separate transaction or occurrence . . . must be stated in a separate count" if "doing so would promote clarity."   Nevertheless, the connection between the plaintiffs' allegations and their "Claims for Relief" are so elliptical as to be obscure—for example, the bare references to matters "as recounted in detail herein" ("First Claim," ¶ 53; "Second Claim" ¶ 61; "Third Claim" ¶ 69; "Fourth Claim" ¶ 76; "Fifth Claim" ¶ 84; "Ninth Claim" ¶ 107; "Tenth Claim" ¶ 115; "Eleventh Claim" ¶ 124); or "as described herein" ("Thirteenth Claim" ¶ 137; "Fourteenth Claim" ¶ 143); or "[d]uring the period of plaintiffs' employment" ("Fifth Claim" ¶ 87); or "[i]n all periods of Plaintiffs' employment." ("Sixth Claim" ¶ 96; "Seventh Claim" ¶ 100) Other claims don't even attempt such references, but instead merely re-allege and incorporate all unspecified allegations. (See "Sixth Claim" ¶ 94; "Seventh Claim" ¶ 99; "Eighth Claim" ¶103).  The clarity demanded by Rule 10(b) has been lost.

"If a pleading fails to specify the allegations in a manner that provides sufficient notice, a defendant can move for a more definite statement under Rule 12(e) before responding." Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514 (2002). It is axiomatic that where a count "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" it should be allowed to stand.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  Except for fraud counts, Twombly does not require heightened specific fact pleading, but sufficient facts must be pleaded "to nudge [a plaintiff's] claims across the line from conceivable to plausible."  Walia v. Veritas Healthcare Solutions, LLC, No. 13 Civ. 6935 (KPF), 2015 WL 4743542, at *3 (S.D.N.Y. 2015) (quoting In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007)).  But this also assumes that the complaint's factual matter also clearly states the elements of the claim.  "[W]here 'the movant

shows that there actually is a substantial threshold question that may be dispositive, such a critical date, a more definite statement may be warranted.'" In re Fosamax Prods. Liab. Litig., No. 06 MD 1789 (JFK), 2013 WL 6669706, at *2 (S.D.N.Y., Dec. 18, 2013) (quoting 5C C. Wright & A. Miller, Federal Practice and Procedure § 1376, at 336 (3d ed. 2004)).

Thus, if dispositive elements of a cause of action have been omitted, or are obscure (as here), a motion for a more definite statement should be granted.  See, e.g., Pelman v. McDonald's Corp., 396 F. Supp. 2d 439, 442 (S.D.N.Y. 2005) ("a 12(e) motion is proper when a complaint pleads a viable legal theory, but is so unclear that the opposing party cannot respond to the complaint"); Kelly v. L.L. Cool J., 145 F.R.D. 32, 36-37 (S.D.N.Y. 1992); Resolution Trust Corp. v. 260-68 Elizabeth St. Owners Assocs., No. 92 Civ. 4756 (SWK), 1997 WL 202109, at *5 (S.D.N.Y., Apr. 24, 1997).

Regarding the acts and omissions underlying the causes of action, the elements of each of the fourteen "Claims for Relief" are missing, or obscure, so that their pleading should be made more definite, or the claim dismissed.  Rule 12(e) is appropriately invoked, for each claim, the following reasons.  Additionally, two claims (fraud in the "Eleventh Claim," and "Intentional Infliction of Emotional Distress" in the "Thirteenth Claim") are too infirm to be resuscitated, and they should be dismissed.

### A. "First Claim for Relief," "Second Claim for Relief," and "Third Claim for Relief": Trafficking Victims Protection Act Claims

The first three counts allege causes of action under the Trafficking Victims Protection Act, 18 U.S.C. §§ 1589 et seq. (TVPRA).

The "First Claim," under §§ 1590 & 1595, avers that the defendants' "trafficking crimes were committed in the United States and Qatar" (¶ 53), without specifying which "crimes" were

committed where. (¶¶ 52-59)

The "Second Claim" alleges forced labor under § 1589 (¶¶ 60-67); it refers to "intimidation," "threats," "coercion," "isolation," and threats of "blackballing" by the Larams. (¶ 61).  It also states that the defendants threatened "legal charges" (¶ 64), but in the Complaint all such "threats" are alleged "on information and belief." (¶ 36)

The "Third Claim" (¶¶ 68-73) is made under § 1592, for having "concealed, removed, confiscate, and/or possessed" the plaintiffs' passports in order to restrict their movements. (¶ 69) The Complaint alleges passports were "confiscated" (¶¶ 19, 30).  But there were periods when, apparently, the plaintiffs held their passports.  (¶ 33-34)

The difficulty in parsing out these claims is that they refer to a broad sweep of actions multiple continents, over several years.

For all the claims recited in the Complaint, the fundamental presumption must be that, unless a statutory enactment specifically provides otherwise, no law has extraterritorial application.  E.g., Kiobel v. Royal Dutch Shell Petro. Co., __ U.S. __, 133 S.Ct. 1659, 1663-64 (2013).  Admittedly, the TVPRA was amended in 2008 to give the Act expanded extraterritorial reach, but only to cases where the defendant is a United States national or green-card holder, 18 U.S.C. § 1596(a)(1), or where "an alleged offender is present in the United States, irrespective of the nationality of the alleged offender," 18 U.S.C. § 1596(a)(2) (emphasis added).  The plaintiffs do not allege—nor could they—that the defendants are United States nationals of green-card holders, or that defendants are present in the United States.  To the contrary, they correctly state that "they no longer reside in the United States, and have returned to their homes [sic] in Qatar." (¶ 9) Moreover, the Summons filed in this case is addressed to defendants in Doha, Qatar.  (DE #4) The first Proof of Service that plaintiffs filed refers to an address in Doha as "Yousef,s house

[sic]."  (DE #8) The second Proof of Service claims the defendants were "personally served" in Doha. (DE #13) There can be little doubt that plaintiffs have conceded that the defendants are not "present in" the United States for purposes of § 1596(a)(2).  Accordingly, there is no extraterritorial jurisdiction over acts and omissions that occurred outside the United States. To be able to draft and file a responsive pleading, it is essential that the plaintiffs more definitely state which underlying acts were committed in the United States, and which were done abroad. [1]

Nor do these first three "Claims" distinguish between the alleged conduct of the defendants, and the alleged conduct of others not before the Court (for example, acts of Philippines employment agencies in signing up the plaintiffs, or in allegedly "blacklisting" others), or distinguish between acts and omissions alleged against the defendants and other members of their family, who are not before the Court.

Accordingly, the Court should direct that the TVPRA counts more definitely identify the acts and omissions that giving rise to each claim, and, importantly, where and when such acts and omissions alleged in the Complaint occurred.  Otherwise, the "First Claim," "Second Claim," and "Third Claim" claims should be dismissed.

**B.  "Fourth Claim for Relief": Fair Labor Standards Act Claim**

The fourth count invokes the Fair Labor Standards Act, 29 U.S.C. §§ 201 et seq. (FLSA), and claims the defendants failed to pay minimum wages. (¶¶ 74-82) The conduct is alleged in conclusory fashion to be "willful."  (¶ 80) As for specific acts and omissions, it says only that this claim arises from conduct at "all relevant times." (¶ 76)

---

[1] It should be noted that the TVPRA's limited extraterritorial jurisdiction under § 1596 could be subject to further challenge.  In the Supreme Court, a petition for certiorari has been fully briefed and is ready for decision; it challenges the validity of the TVPRA's extraterritorial jurisdiction under the Commerce Clause.  See Damon St. Patrick Baston v. United States, No. 16-5454 (cert. pet. filed July 28, 2016; distributed for Conference of Feb. 17, 2017).

For both FLSA and New York Labor Law allegations (discussed below), the Complaint recites a series conclusory statements, each beginning "At all times relevant to this action," ostensibly to make out claims. ¶¶ 37-43, 49) These statements, however, cast no light on the acts or omissions on which the claims are premised.

The FLSA claim is asserted but without specification of where the underlying actions might have occurred.  As with the TVPRA claims, if the acts and omissions underlying the FLSA claim occurred outside the United States, for example, in Qatar or the Philippines, they would not be actionable under FLSA.  Kiobel, supra, __ U.S. at __, 133 S.Ct. at 1663. Moreover, this count does not specify which acts or omissions alleged in the Complaint had occurred within the two-year limitations period allowed for FLSA claims (or within the three-year period for "willful" cases).  29 U.S.C. § 255(a).

Accordingly, the Court should direct that the "Fourth Claim" be more definitely re-pleaded, by specifying the acts or omissions giving rise to it, and, as to each act, specifying whether it occurred in the United States or abroad, and specifying when it occurred.  Otherwise, the "Fourth Claim" should be dismissed.

### C.  "Fifth Claim for Relief", "Sixth Claim for Relief", "Seventh Claim for Relief", and "Eighth Claim for Relief": New York State Labor Law Claims

Each of the next four counts allege a violation of New York State labor laws and regulations, including violations of minimum wage requirements ("Fifth Claim ¶¶ 83-93), unlawful deductions ("Sixth Claim" ¶¶ 94-98), violations of overtime rules ("Seventh Claim" ¶¶ 99-102), and violation of spread-of-hours rules ("Eighth Claim" ¶¶ 103-105).  They sweep so broadly as to include all conduct that occurred during all phases of defendants' employment, and wherever employment occurred, whether in the United States or abroad.

The "Fifth Claim" recites that the claim arose "[d]uring the period of Plaintiffs'

employment."  (¶ 87) The "Sixth Claim" is similarly fashioned to sanction the defendants'

conduct "[i]n all periods of Plaintiffs' employment" (¶ 96) The "Seventh Claim" covers "all

periods of Plaintiffs' employment," as well. (¶ 100) "All periods of employment," however,

would entail conduct that occurred at any time from 2009 to 2015, and conduct occurring in

Qatar as well as in the United States.  The Complaint says that the Plaintiffs' were employed in

both Qatar and the United States. (¶¶ 10, 24) But claims arising outside the United States are not

cognizable.  The "Eighth Claim" makes no reference to time or place, but merely re-alleges and

incorporates allegations made elsewhere, without specificity. (¶ 106)

Accordingly, the Court should direct the plaintiffs to more definitely state which acts and

omissions alleged to be grounds for these claims, occurred in the United States, and, as to each

such act, when it occurred.  Otherwise, the "Fifth Claim, "Sixth Claim," "Seventh Claim," and

"Eighth Claim" should be dismissed.

### D.  "Ninth Claim for Relief": Breach of Contract

The ninth count is a common-law breach-of-contract claim.  Unlike the other claim, this

one is against only defendant Yousef Laram.  Neither of the plaintiffs, however, seem to have

identified which contracts that have been breached, except to allege they were for "employment

as housekeepers at the New York Residence" of the defendants. (¶ 107) The count avers, for

example, that the defendant violated the contracts' "express terms and conditions," while the

plaintiffs satisfied them. (¶¶ 108, 109, 110) But the Complaint identifies only one contract for

Ms. Sulaiman, dated June 2013 (attached as Exhibit A to the Complaint), with terms "substantial

similar [sic]" to another contract alleged to have been signed in 2011.  (¶ 15) In the same way,

the Complaint recites that plaintiff Cabilocan's contract is "substantially similar" to a copy

attached to the Complaint. (¶ 26) It further should be noted that the contracts in Exhibits A and B

are not identical to each other; it is also apparently alleged other contracts are in issue, too, since contracts were allegedly renewed every two years. (¶¶ 33) At the least, the two plaintiffs' breach-of-contract claims should specify the contracts, and their terms, that the defendant is alleged to have actually breached, not "similar" ones.

The allegations state that the contracts were for two-year terms and subject to renewal, but the Complaint does not identify Sulaiman's alleged first contract, or other contracts beside the one offered in Exhibit A.  Nor are the "terms and conditions" which had been violated specified.  The Court should direct that the plaintiffs identify <u>each</u> contract, of which a breach is alleged. As to each contract, the plaintiffs should identify where and when it was signed, as well as the terms in each that were breached.  Otherwise, the "Ninth Claim" should be dismissed.

**E.  "Tenth Claim for Relief": Quantum Meruit Claim**

The tenth count recites a <u>quantum meruit</u> claim, which, without elaboration, demands the recovery of benefits "conferred on Defendants." (¶ 116) As with other counts, the "Tenth Claim," does not state the benefits that were actually conferred, or where they had been conferred, or when they were conferred.  It does not identify where and when the defendants "instructed, supervised, accepted, and retained" these services. (¶ 117)    The count does not specify whether that the benefits were conferred in Qatar, in the Philippines, or in the United States. Nor does it identify to whom the benefits accrued.  (See ¶ 116.) Moreover, as with other counts related to the contracts alleged between the parties, it does not specify which "valid and binding employment contract," "outside the scope of" which the plaintiffs performed "additional and unanticipated work." (¶ 115)

Accordingly, the Court should direct that the plaintiffs identify what the benefits alleged in the "Tenth Claim" are, and, as to each benefit, where and when they were conferred on the

defendants.  Furthermore, the plaintiffs should be directed to identify each contract, and its

terms, outside the scope of which additional and unanticipated work was performed.  Otherwise,

the "Tenth Claim" should be dismissed.

### F.  "Eleventh Claim for Relief": Fraud

The eleventh count is common-law fraud claim, is defective for several reasons, and it

should be dismissed.

Under New York law, the elements of fraud consist of: "1) a representation of fact; 2)

which is either untrue and known to be untrue or recklessly made; 3) offered to deceive and to

induce the plaintiff to act upon it; 4) which is justifiably relied on by the plaintiff; 5) causing

injury to the plaintiff."  Monaco v. Carpinello, No. CV-98-3386 (CPS), 2004 WL 3090598, at *9

(E.D.N.Y., July 19, 2004) (quoting Koehler v. Bank of Bermuda (New York) Ltd., 209 F.3d 130,

136 (2d Cir. 2000)); see also Tanzman v. La Pietra, 8 A.D.3d 706, 778 (N.Y. App. Div., 3d

Dep't 2004).

Rule 9(b) imposes stricter requirements to pleading fraud or mistake than to other claims:

"In allegations of fraud or mistake, a party must state with particularity the circumstance

constituting fraud or mistake.  Malice, intent, knowledge and other conditions of a person's mind

may be alleged generally."  The particularity requirement for pleading fraud demands, among

other things, that the plaintiffs specify what misrepresentations were made, where the

misrepresentations were made, and when they were made.  "An allegation of time and place is

material when testing the sufficiency of a pleading."  Fed.R.Civ.P. 9(f).

To comply with this heightened pleading requirement for the first element, the

misrepresentation, the plaintiff must specify "(1) those statements the plaintiff thinks were

fraudulent, (2) the speaker, (3) where and when they were made, and (4) why plaintiff believes

they are fraudulent." Cromer Fin. v. Berger, 137 F. Supp. 2d 452, 468 (S.D.N.Y. 2001) (quoting Koehler, supra, 209 F.3d at 136). Put another way, "[a] fraud claim should specify the who, what, when, where, and how of the alleged fraud." In re Methyl Tertiary Butyl Ether Prods. Liab. Litig., 379 F. Supp. 2d 348, 369 (S.D.N.Y. 2005). Furthermore, even though intent or scienter may be pleaded generally, "the plaintiff must allege facts that give rise to a strong inference of fraudulent intent." Id. The plaintiffs have failed to clear several pleading hurdles.

The "Eleventh Claim" asserts that defendants misrepresented "the terms and conditions of Plaintiffs' anticipated employment, including expected wages, living arrangements, time off, and other benefits." (¶ 124) The count states that the material misrepresentation was the "terms and conditions of Plaintiffs' anticipated employment." (¶ 124) The specific "misrepresentations" offered, however, are just terms of the employment contracts attached to the Complaint. (¶¶15, 26)

Furthermore, these misrepresentations allegedly were made knowingly in order to induce reliance on the plaintiffs' part to travel to the United States and work for the defendants. (¶¶ 124-127) The exhibited contracts are, again, offered as evidence of the defendant's knowledge of falsity. According to the plaintiffs, the defendants "had no intention of honoring the contract" (¶¶ 16, 27), and "[t]he Defendants' subsequent conduct reveals that when they made the above-mentioned statements, Defendants had absolutely no intention of honoring them in the future." (¶ 125) From this, plaintiffs argue that "[t]he statements were thus knowingly false when made." (¶ 125, 127)

This is simply a contract claim wearing the costume of a fraud claim. The evidence of scienter is simply the contract, plus the contract's later alleged breach, which the plaintiffs allege was what the defendants intended all along. As the Second Circuit explained, however, this sort

of fraud is just redundant pleading; it fails because

> "under New York law, where a fraud claim arises out of the same facts as plaintiff's breach of contract claim, with the addition only of an allegation that defendant never intended to perform the precise promises spelled out in the contract between the parties, the fraud claim is redundant and plaintiff's sole remedy is for breach of contract.  In other words, simply dressing up a breach of contract claim by further alleging that the promisor had not intention, at the time of the contract's making, to perform its obligations thereunder, is insufficient to state an independent tort claim."

Telecom Int'l Am., Ltd. v. AT&T Corp., 280 F.3d 175, 196 (2d Cir. 2001) (internal quotations and citations omitted); see also Continental Petroleum Corp. v. Corp. Funding Partners, LLC, No. 11 Civ. 7801 (PAE), 2012 WL 1231775, at *10 (S.D.N.Y. Apr. 11, 2012) (citing Telecom in dismissing "plaintiffs' claims for fraud, fraud in the inducement, and deceptive practices" for inadequate pleading).  To say that the misrepresentation is the contract, and that the scienter is proven by the contract and breach, does not achieve the special pleading requirements of fraud.

It is also useful to distinguish plaintiff Sulaiman's fraud claim from plaintiff Cabilocan's. In Sulaiman's case, according to the Complaint, the contract containing the alleged misrepresentations is not attached, but instead a "substantial similar [sic]" one is shown in the pleading. (¶ 15) According to the Complaint, the alleged fraudulent conduct occurred in Qatar, not the United States: The contract was alleged to have been signed in Qatar. (¶ 15) (The Complaint does not say where her other contracts were signed.) The inducement was alleged to have occurred in Qatar. (¶¶ 15-16, 124-125) The alleged misrepresentations were made in Qatar. (¶¶ 15, 124) Only the underpayment and conditions of work occurred in the United States (¶ 18), but this is not sufficient to make a claim for a common-law fraud occurring in New York.

Furthermore, if one accepts the claim that Sulaiman's reliance was fraudulently induced when she signed the 2011 contract, it is impossible to see that any damages accrued after June

12, 2013—at the very latest—when she signed her next two-year contract.  (This contract apparently is the one attached to the Complaint as Exhibit A.)  According to the Complaint, between 2011 and 2013, Ms. Sulaiman allegedly experienced conditions that were "shocking," "appalling," "egregious," and "inhumane," plus underpayment of wages and long hours, as well as acts of mistreatment, by the time her next contract was signed in 2013.  With this foreknowledge, she cannot have been fraudulently "induced" to sign a second contract in 2013.  This should be enough to negate any reliance or damages Sulaiman claims at least from mid-2013 on.  What is more, she was able to return to the Philippines before the 2013 contract was signed, and yet signed the second contract and came back to New York again for a second two-year contract period.

Plaintiff Cabilocan's fraud claim presents an even more tenuous theory.  According to the Complaint, it was Cabilocan's co-plaintiff, Sulaiman (her cousin) who "found" her and suggested, in 2014, to apply to come and work for the defendants in New York. (¶ 24) By that time, Ms. Sulaiman had worked for the defendants in New York City for several years—and allegedly had experienced the non-payment of wages, as well as the mistreatment, unbearable working hours, and abominable conditions alleged. (¶ 24) Nevertheless, after Sulaiman's "contact" with Cabilocan in 2014, Cabilocan agreed to fly to Qatar, sign a contract, work for defendants' family in Qatar, and later fly to New York to work for the defendants.  (¶¶ 24-25)

According to the Complaint, in Cabilocan's case, neither of the defendants were present when she started to work in Qatar, where she worked for other members of the family (again, not for the defendants). (¶¶ 25-26) Cabilocan claims not to have been paid the promised wages in Qatar, and to have witnessed alleged mistreatment of other domestic workers, also in Qatar, but there is no allegation that she herself was mistreated, or that the defendants were in any way

responsible for her working terms and conditions in Qatar. (¶ 25)

As with Sulaiman's fraud claim, Cabilocan refers to a "substantially similar copy" of the agreement she allegedly signed in Qatar, which allegedly induced her to work for the defendants in the United States.  (¶ 26)   This is the first point in time that the defendants actually appear in the narrative of Cabilocan's experiences. Moreover, Cabilocan admits that before signing she "understood that conditions would be difficult" when she signed the contract. (¶ 26) Guided by the allegations in the Complaint, it seems that she went into the situation with her eyes open; there was no detrimental reliance here.

In short: (1) The fraud claims are merely contract claims "dressed up" as torts, which is impermissible in New York.  (2) Neither plaintiff's fraud claim specifies the actual contract that was alleged to have been fraudulently tendered for signature.  (3) Neither plaintiff specifies which (if any) contract-related representations were fraudulently made, except to assert that defendants "had absolutely no intention of honoring them in the future" (¶ 125), which is inadequate under New York law.  (4) Assuming the truth of the allegations, Ms. Sulaiman should have possessed sufficient notice of the allegedly fraudulent intentions of the defendants by the time she renewed her agreement in June 2013.  (See ¶¶ 17 & Exhibit A to Complaint, Sulaiman's renewal contract date June 2013.)  It is implausible that there could have been any detrimental reliance after the two-year term of the first agreement had expired.  (5) Plaintiff Cabilocan decided to work for the defendants in New York after Ms. Sulaiman got in touch with her. By the time the cousins connected, Sulaiman would have worked for the defendants in New York for three years, and for the family for at least six years.  If Sulaiman informed Cabilocan of the allegedly abominable conditions, there could have been no reliance.  If Sulaiman did not tell her, however, the she becomes complicit in the fraud perpetrated on Cabilocan.  Based on the facial

allegations in the Complaint, the fraud count, the "Eleventh Claim for Relief," is fatally defective.  Fraud has not been alleged within the meaning of that term in Rule 9 and New York law.

Accordingly, the Court should dismiss the "Eleventh Claim."

The remaining three counts also lack sufficient clarity about the conduct that the defendants must answer for.

### G.  "Twelfth Claim for Relief": Conversion

The twelfth count is for common-law conversion.  It alleges that the defendants exercised "unauthorized dominion and control" over the defendants' travel documents, does not specify where and when the acts underlying the claim took place.  Conversion is a trespass to personal property, with a three-year statute of limitations.  See N.Y. C.P.L.R. ¶ 214.  The plaintiffs allege that the defendants took their passports from them (¶¶ 19, 30, 34), but the Complaint also indicates that one of the plaintiffs, Ms. Sulaiman, had possession of her passport for substantial periods of time.  (See ¶ 34) The Complaint says that Sulaiman periodically went home for several weeks at least twice during her stay in New York.  One infers, therefore, that she had possession of her passport.  Here, the Complaint does not specifically allege a conversion that occurred within the three-year limitations period.  Nor does it specify when the defendants allegedly "confiscated" their passports.

Accordingly, the Court should direct that the "Twelfth Claim" be more definitely re-pleaded, specifying, as to each plaintiff, when the alleged conversions took place.  Otherwise, the "Twelfth Claim" should be dismissed.

### H.  "Thirteenth Claim for Relief": Intentional Infliction of Emotional Distress

The thirteenth count is for intentional infliction of emotional distress.  As with the other claims, it does not specify which conduct constitutes the alleged tort—or, significantly, where and when such acts and omissions, on which the claim is premised, occurred.  From a reading of the Complaint, it seems plain that much of the alleged conduct occurred outside the United States and so is not actionable in this Court under <u>Kiobel</u>.  Nor are special damages alleged, beyond the conclusory allegations that plaintiff Sulaiman "developed medical conditions because stress"[2] (¶ 22), and that both plaintiffs "suffered severe psychological trauma."  (¶ 51)

Nevertheless, here the claim must be dismissed for simpler irremediable defect: In New York, the intentional-infliction cause of action has a one-year limitations period.  See N.Y. C.P.L.R. § 215(3).  The Complaint states that the plaintiffs made their "escape" from the defendants on April 22, 2015.  This was eighteen months before the Complaint was filed, on October 19, 2016.  The Complaint does not allege any acts or omissions within the limitations period.  Thus, the limitations period for this claim has expired.

Accordingly, the "Thirteenth Claim" should be dismissed.

### I.  "Fourteenth Claim for Relief": Negligent Infliction of Emotional Distress

The fourteenth claim, for negligent infliction of emotional distress, takes a three-year statute of limitations.  <u>See, e.g.</u>, N.Y. C.P.L.R. §214(4); 75A N.Y. Jur., Limitations & Laches, § 215.  The problem with this claim, like the others, is that it asserted in only general terms.  The Complaint does not state the conduct that led to the plaintiffs' injuries, or when it occurred, or

---

[2] Ms. Sulaiman alleges she got an eye condition, but this was caused by "lack of light in the apartment" (¶ 22), and a facial rash, the cause of which is not alleged (¶ 23).

where it occurred.  Nor are special damages alleged.  The wide-ranging intercontinental conduct, alleged to have occurred over approximately six years, is not definite enough to identify which acts or omissions occurred in New York, during the three years before the Complaint was filed.

Accordingly, the Court should direct the plaintiffs to make a more definite statement of the actionable conduct from which then "Fourteenth Claim" arises, and where it accrued. Otherwise, the "Fourteenth Claim" should be dismissed.

## II.    Several Statements in the Complaint Should Be RePleaded, or Stricken as Immaterial and Scandalous

Federal Rule of Civil Procedure 12(f) permits the striking out of "any redundant, immaterial, impertinent, or scandalous matter."  Much of the desultory narrative of allegations in ¶¶ 10-51 should be re-stated clearly within the meaning Rule 12(e), or they should be stricken under Rule 12(f).

### A.  ¶¶ 11-12, 25

Paragraph 11, for example, describes disciplinary action taken against another domestic employee, not identified and not before this Court.  It states that "the Defendants" disciplined this anonymous employee, but that the anonymous employee was "blacklisted" by the defendant Miriam Laram's "family."  Paragraph 12 similarly states that plaintiff Sulaiman felt "compelled to comply with the Laram family demands."  From a reading of the Complaint, it appears that, in Qatar, Sulaiman was working for the defendants' extended family in a "compound" of residences, not just for the defendants if she was working for the defendants at all.  Paragraph 25 alleges that plaintiff Cabilocan worked for "family members" of the defendants themselves, and that she was "not paid the amount promised in her employment contract" and was "mistreated and threatened by Laram family members."  It goes on to recount dismissals, and physical

expulsion from the family residence in Qatar, of other employees, but not of the plaintiff, and not by the defendants.

Recitals of such misconduct, not specifically alleged against the defendants, drift outside the "short and plain statement" showing entitlement to relief that Rule 8(a) requires.  Rather, they seem to have been inserted in the Complaint for their shock value, and to attack people who are not before this Court, who are not in a position to answer these allegations.

The Court should direct that these statements in ¶¶ 11-12 and 25 of the Complaint be re-pleaded to make specific and relevant allegations against the defendants, or stricken as redundant, immaterial, impertinent or scandalous" within the meaning of Rule 12(f).

### B.   ¶¶ 15-16, 26-27, 33

These paragraphs refer to contracts the plaintiffs signed before traveling to New York to work for the defendants.  One contract, dated two years after plaintiff Sulaiman started working in New York, is attached to and quoted in the Complaint; it is called "substantial similar [sic]" to the contract that Sulaiman signed. (¶ 15) The contract for Cabilocan that is attached and quoted is a contract that is a "substantially similar copy" of the contract that Cabilocan had signed. (¶ 26) Other contracts between the parties are alleged, but not identified or described. (¶ 33) Practically all counts depend on knowing the terms of the contracts that were signed, most especially the fraud count and the breach-of-contract count.

The Court should direct the plaintiffs to more definitely state all the contracts that are alleged to have bound the parties, and when and where they were signed.

### C.   ¶¶ 20, 29, 31, 32, 35

The Complaint contains several redundant, immaterial and scandalous statements that veer beyond the "short and plain statement" of grounds for entitlement to relief necessary under the Federal Rule 8(a).  Specifically:

"Ms. Sulaiman and Ms. Cabilocan seek redress for these egregious violations of their basic rights." (¶ 4)

"Ms. Sulaiman's living conditions in the New York apartment were abominable."  (¶ 20)

"Once in New York, the Defendants' treatment of Ms. Cabilocan was appalling and inhumane." (¶ 29)

"The Defendants' treatment of Ms. Sulaiman and Ms. Cabilocan is especially shocking considering that, on information and belief, Mr. Laram hypocritically spoke against those same practices in his position with the U.N. Qatar Mission, urging an end to 'today's slave-like practice,' including human trafficking." (¶ 31)

"Ms. Cabilocan soon recognized that her new life with the Defendants was a form of modern slavery, and eventually persuaded Ms. Sulaiman that they had no choice but to escape." (¶ 32)

"On April 22, 2015, while they were left in the apartment alone, Ms. Sulaiman and Ms. Cabilocan escaped.  Ms. Cabilocan left first while Ms. Sulaiman stayed behind momentarily with the door cracked open.  Ms. Cabilocan walked halfway down the hallway to look around.  She then gave Ms. Sulaiman a sign with her hands to tell her that the hallway was clear." (¶ 35)

These assertions and vignettes seem useful for one purpose: to excite and inflame a jury. A motion to strike should be granted if it is shown that (1) there is no evidence in support of the allegations that would be admissible; (2) the allegations have no bearing on the issues in the case; and (3) permitting the allegations to stand would prejudice to the movant. See, e.g., Lipsky v. Commonwealth United Corp., 551 F.2d 887, 893 (2d Cir. 1976); Roe v. City of N.Y, 151 F. Supp. 2d 495, 510 (S.D.N.Y. 2001).  The quoted excerpts from the Complaint do nothing to elucidate the plaintiffs' claims.

Accordingly, the Court should direct that the paragraphs in the Complaint, in which the above-quoted excerpts appear, be re-pleaded, or that their immaterial and scandalous matters be

stricken.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Complaint, or direct the plaintiffs to file more definite statements of their claims.  Additionally, the Court should strike from the Complaint immaterial and scandalous statements, or direct that they be re-pleaded.

Respectfully submitted,

_____

Daniel N. Arshack
Arshack, Hajek & Lehrman PLLC
1790 Broadway, Suite 710
New York, N.Y. 10019
(212) 582-6500
**Dan@LawAHL.com**
Attorney for the Defendants
Yousef and Miriam Laram