UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————————x

NORMIA CABILOCAN SULAIMAN and
MOHARIA SAWMANG CABILOCAN,

            Plaintiffs,

        v.                                                          No. 16 Civ. 8182 (CM)

YOUSEF LARAM and MIRIAM LARAM,

            Defendants.

—————————————————————————x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 4/4/17

**DECISION AND ORDER GRANTING IN PART AND DENYING IN SUBSTANTIAL
PART DEFENDANTS' MOTION TO DISMISS, OR, IN THE ALTERNATIVE, FOR A
MORE DEFINITE STATEMENT, AND DENYING THE MOTION TO STRIKE**

McMahon, C.J.:

Plaintiffs Normia Cabilocan Sulaiman ("Sulaiman") and Moharia Sawmang Cabilocan

("Cabilocan") (collectively, "Plaintiffs") bring this action against Defendants Yousef Laram

("Mr. Laram") and Miriam Laram ("Ms. Laram") (collectively, "Defendants"), alleging:

violations of the Trafficking Victims Protection Act ("TVPRA"); violations of the Fair Labor

Standards Act ("FLSA") and New York Labor Law ("NYLL"); breach of contract; unjust

enrichment and quantum meruit; common law fraud; conversion; intentional infliction of

emotional distress ("IIED"); and negligent infliction of emotional distress ("NIED").

Defendants move to dismiss Plaintiffs' claims under Fed. R. Civ. P. 12(b)(6).

Alternatively, Defendants move for a more definite statement of the allegations in the Complaint,

pursuant to Fed. R. Civ. P. 12(e); and to strike certain allegations from the Complaint, pursuant

to Fed. R. Civ. P. 12(f).

For the reasons set forth below, Defendants' motion to dismiss is GRANTED as to Plaintiffs' claims for common law fraud, IIED, and NIED. Defendants' motion is DENIED in all other respects.

## BACKGROUND[1]

Sulaiman is a citizen of the Philippines. (Compl. ¶ 7.) In 2009, she traveled to Qatar to work as a housekeeper in Defendants' home. (*Id.* ¶ 10.) While there, Sulaiman was "paid far less than promised . . . worked from 5:30 a.m. to 11:00 p.m. every day, and without any days off; and handled all of the family's cooking, housekeeping, ironing, upkeep of the residence, and other duties." (*Id.* ¶ 12.). In addition to these duties, Sulaiman was made a full-time nanny after Ms. Laram had her first child in 2010. Hence, she was on call to care for the child from 11:00 p.m. to 5:30 a.m., every day. (*Id.* ¶ 13.)

In Qatar, Sulaiman saw her coworkers "suffer severe consequences" for their disobedience. (*Id.* ¶ 11.) For example, when another housekeeper was caught using a cellphone without permission, she was dismissed and sent back to the Philippines within days of the infraction. (*Id.*) Also, according to Ms. Laram, Defendants' family "blacklisted the worker from all domestic work agencies in the Philippines, so that the worker would never find work as a housekeeper again." (*Id.*) Ms. Laram often retailed this episode as a means of intimidating Sulaiman. (*Id.*)

In 2011, Mr. Laram was appointed First Secretary and Deputy Permanent Representative for the U.N. Qatar Mission, so Defendants had to move to New York. (*Id.* ¶ 14.) Ms. Laram insisted that Sulaiman join them. (*Id.*) To do so, Sulaiman needed a work visa; and to get a work

---

[1] The following facts are drawn directly from the allegations and exhibits of the Complaint (Dkt. No. 1 ("Compl.")) and are taken as true for purposes of the instant motion.

visa, she had to enter an employment contract with Defendants. Her 2011 contract contained terms "substantially similar" to the following terms from her 2013 contract:

1. [Defendants] hire [] Sulaiman, as a House keeper at the Official resident at the 845 United Nations Plaza, Apt: 49B New York, NY 10017. The prescribed working hours shall not exceed more than eight (8) hours per day and case of any excess [of] however Employee shall be entitled to overtime pay of time and half figured on per hour basis.

   . . .

3. The CONTRACT is valid for period of two (2) years effective upon [Sulaiman's] departure from the point of hire and may be renewed only in writing as mutually agreed upon by both parties, the terms and conditions, shall likewise be specified.

4. [Sulaiman] shall enjoy one (1) day off per week in addition [to] three weeks vacation every year and all other official holidays observe by the [U.N. Qatar] Mission.

5. [Sulaiman] will be paid $9.82 per hour based on $471.36 per week of One Thousand Eight Hundred and eighty five & fourth four dollars (1885.44) paid by the end of each month.

6. [Defendants] agree[] to be responsible for the medical insurance coverage of [Sulaiman].

7. [Defendants] will provide [Sulaiman] appropriate full furnished residence at the above mentioned address.

8. [Defendants] will not hold passport, visa and any other personal properties from [Sulaiman].

   . . .

11. [Defendants] will not deduct any money for lodging and food, from [Sulaiman's] wages.

(*Id.* ¶ 15; Ex. A.) Defendants submitted the contract to the U.S. government and obtained a visa for Sulaiman. (*Id.* ¶ 16.)

Together, Sulaiman and the Defendants moved to New York in July 2011. (*Id.* ¶ 17.) Around that time, Ms. Laram gave birth to her second child, and Sulaiman became responsible

for its care. (*Id.* ¶¶ 17, 18.) Besides attending to her nanny and housekeeping responsibilities, Sulaiman continued to prepare Defendants' meals. (*Id.* ¶ 18.)

Sulaiman had expected her working conditions to improve in the United States, but Defendants dashed her hopes by continuing to mistreat her. Once the parties arrived in New York, Ms. Laram confiscated Sulaiman's passport and refused to return it. (*Id.* ¶ 19.) Defendants forced Sulaiman to work from 5:30 a.m. to 11:00 p.m. She was on call to care for the children from 11:00 p.m. to 5:30 a.m. (*Id.* ¶ 18.) Defendants paid Sulaiman just $350 a month, despite having contracted to pay her a monthly salary of at least $1,885.44. (*Id.*)

Moreover, Sulaiman's living conditions in New York "were abominable." (*Id.* ¶ 20.) She was forced to sleep in Defendants' pantry and her meals consisted of leftover food that made her ill. (*Id.*) Ms. Laram would disparage Sulaiman as a "slave" and an "animal," and would slap Sulaiman as punishment for perceived poor performance. (*Id.*) Defendants prohibited Sulaiman from leaving the apartment, gave her no key, and threatened that if she did go outside, "she would die in the streets or be arrested and subjected to legal action." (*Id.* ¶ 21.)

The stress resulting from all this caused Sulaiman to develop health problems, but Defendants limited her access to medical care. For example, when Sulaiman developed an eye problem, Defendants refused to let her see a doctor about it. (*Id.* ¶ 22.) In 2012, when Sulaiman developed a rash on her face, Defendants initially refused to let her get it treated. (*Id.* ¶ 23.) Eventually, though, the rash became so bad that Defendants relented and took Sulaiman to see a doctor. (*Id.*) One doctor's treatment failed to eradicate the rash, so Sulaiman asked Defendants to take her to a different physician. They refused at first, but eventually relented. The new doctor asked Sulaiman questions about what she was doing in the United States; this angered

Defendants so much that they ended the visit before the doctor had a chance to examine Sulaiman. (*Id.*)

In 2014, after becoming pregnant with her third child, Ms. Laram instructed Sulaiman to recruit additional help from the Philippines. (*Id.* ¶ 24.) Sulaiman was able to get her cousin, Cabilocan, to take the job.

Before traveling to the United States, Cabilocan went to Qatar to train with Defendants' family members. (*Id.* ¶ 25.) While there, Cabilocan "was not paid the amount she was promised in her employment contract, and was mistreated and threatened by Laram family members in other ways as well." (*Id.*) She witnessed the summary dismissal of two employees who worked for Ms. Laram's mother, and watched as they were physically dragged from the house by Ms. Laram's brother. (*Id.*)

So that she could obtain a visa to work in the United States, Cabilocan and Defendants entered a contract for Cabilocan's employment in New York. (*Id.* ¶ 26.) The contract's terms essentially mirrored those in Sulaiman's contract, which is quoted above. (*Id.*) Defendants submitted the contract to the U.S. government and obtained a visa for Cabilocan. (*Id.* ¶ 27.)

When Cabilocan arrived in New York in 2015, Defendants treated her in a way that was "appalling and inhumane." (*Id.* ¶ 29.) They confiscated her passport and refused to return it. (*Id.* ¶ 30.) They told her that "if she ever escaped she would die in the streets or be arrested and subject to deportation or other legal action." (*Id.*) Ms. Laram threatened that Cabilocan would be blacklisted for disobedience, and supported the threat by retailing the story about Sulaiman's coworker in Qatar who was blacklisted by Defendants' family. (*Id.*) Defendants also forced Cabilocan to sleep on the pantry floor along with Sulaiman; gave her rotting food; paid her an illegally low salary, in violation of her contract; and forced her to work from 5:30 a.m. to 11:00

p.m. every day while being on call at all other times. (*Id.* ¶ 29.) Ms. Laram also disparaged Cabilocan as a "slave" and an "animal," and slapped her as punishment for perceived poor performance. (*Id.*)

After realizing that she and Sulaiman were living under "a form of modern slavery," Cabilocan persuaded Sulaiman that they had to escape. (*Id.* ¶ 32.) Their chance presented itself in April 2015. On April 21, Sulaiman returned to New York from the Philippines, where she had gone to renew her employment contract with Defendants. (*Id.* ¶ 33.) Defendants forgot to confiscate her passport when she returned. (*Id.*) That night, Plaintiffs learned that Ms. Laram would be out of the apartment the following morning long enough for them to escape. (*Id.* ¶ 34.) On April 22, Plaintiffs fled the apartment in stealth: Cabilocan left first, scanned the hallway, and signaled to Sulaiman that the coast was clear. Sulaiman followed, and Plaintiffs proceeded to wander the streets until making their way to the Philippine Consulate. (*Id.* ¶ 35.)

After the escape, Defendants made several calls to Cabilocan's parents in the Philippines, demanding to know where Plaintiffs were. (*Id.* ¶ 36.) Ms. Laram told Cabilocan's mother that the police in New York were going to disseminate pictures of Plaintiffs in an effort to find them, and that once found, Plaintiffs would be arrested and deported. (*Id.*)

Plaintiffs filed the Complaint in October 2016, asserting the following fourteen claims: 1) human trafficking, 2) forced labor, and 3) unlawful confiscation of passports under the TVPRA; 4) failure to pay the minimum wage required by the FLSA; 5) failure to pay the minimum wage, 6) unlawful deductions from wages, 7) failure to pay overtime, and 8) spread-of-hours violations under the NYLL; 9) breach of the employment contracts; 10) unjust enrichment and quantum meruit resulting from Plaintiffs' childcare and culinary work; 11) common law fraud, on the ground that Defendants never intended to honor the employment

contracts; 12) the illegal conversion of Plaintiffs' passports, immigration documents, and other personal property; 13) IIED; and 14) NIED. This motion to dismiss followed.

## DISCUSSION

### I.   The Motion to Dismiss Is Denied in Substantial Part and Granted in Part

#### A. Legal Standard for Rule 12(b)(6)

To survive a motion to dismiss brought under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 570).

#### B. The Motion to Dismiss Plaintiffs' TVPRA Claims Is Denied

The TVPRA provides a civil remedy for victims of forced labor. *See* 18 U.S.C. § 1595. It defines "forced labor" as:

> Provid[ing] or obtain[ing] the labor or services of a person by any one of, or by any combination of, the following means – (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person; (2) by means of serious harm or threats of serious harm to that person or another person; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

18 U.S.C. § 1589. Furthermore, "A person who 'knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of' the statutes prohibiting slavery, forced labor or involuntary servitude, is guilty of trafficking." *Swarna v. Al-Awadi*, No. 06 Civ. 4880, 2011 WL 1873356, at *4 (S.D.N.Y. May 12, 2011) (quoting 18 U.S.C. § 1590). Further, "Whoever knowingly destroys, conceals, removes, confiscates, or possesses

any actual or purported passport or other immigration document, or any other actual or purported government identification document, of another person in the course of a violation of" §§ 1589 or 1590, is guilty of unlawful conduct with respect to documents in furtherance of forced labor or trafficking. 18 U.S.C. § 1592.

The Complaint alleges that "Defendants knowingly obtained the services of [Plaintiffs] through means of physical threats, coercion, isolation, physical restraint, and intimidation by maintaining control over the passports of [Plaintiffs], and by causing [Plaintiffs] to fear that they would be arrested, detained, and deported by law enforcement authorities if they escaped." (Compl. ¶ 61; *see also* ¶¶ 53, 54, 69.) The Complaint sets forth plenty of facts to support this and the other allegations underlying Plaintiffs' TVPRA claims.

Defendants' counsel obviously does not understand Rule 8. It says, "A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. Rule 8(a)(2). Rule 8 jurisprudence is quite clear: notice pleading, shorn of details that can be fleshed out in discovery, is sufficient. As long as the complaint asserts some facts that plausibly support the elements of the claim, it cannot be dismissed pursuant to Rule 12(b)(6). *See Twombly*, 550 U.S. at 570. The only caveat is found in Rule 9, which specifies the *very few* instances in which more detailed pleading is required. *See* Fed. R. Civ. P. Rule 9. Violation of the TVPRA is not one of them.

Defendants argue that the Complaint is deficient because it fails to specify where the alleged TVPRA-violating conduct occurred. This is ridiculous. Many of the actions pleaded in the Complaint – including the confiscation of passports, physical abuse, and threats of arrest and deportation – are specifically alleged to have taken place in New York. Moreover, with respect

to Cabilocan, no other locus for illegal conduct is possible, since, unlike her cousin, she never worked for Defendants in Qatar; they were already in the United States when they hired her.

Defendants assert that only conduct occurring in the United States is actionable under the TVPRA. *See* 18 U.S.C. § 1596(a)(1)–(2). There is no need to decide that issue here, because even if Defendants are right, the TVPRA claims would not be dismissed – plenty of conduct allegedly occurred in New York. Furthermore, actions committed elsewhere that are included in the pleading for context do not run afoul of pleading rules. If Defendants are concerned that their behavior in Qatar will factor into this litigation, they are, as Plaintiffs note, free in their answer simply to deny liability to the extent that acts occurred in Qatar. (Pl.'s Mem. at 9, Dkt. No. 17.)

### C.  The Motion to Dismiss Plaintiffs' FLSA and NYLL Claims Is Denied

The FLSA provides that domestic servants in the United States must be paid a minimum wage of $7.25 an hour. 29 U.S.C. § 206(f). There is no exception to this rule for foreign employees who are located in the United States.

To state a claim for unpaid minimum wages, a plaintiff must allege: 1) an employer-employee relationship between the parties; 2) that the plaintiff was a domestic servant of the defendant; and 3) the amount of unpaid minimum wages. *See* 29 U.S.C. § 206; *see also Zhong v. August August Corp.*, 498 F. Supp. 2d 625, 628 (S.D.N.Y. 2007) ("The language of the FLSA's minimum wage . . . provisions establish the elements that should be alleged in order to survive a motion to dismiss."). Actions for unpaid minimum wages must be brought within two years of the violation, or three years if the violation was willful. 29 U.S.C. § 255(a).

The Complaint alleges each of these elements; Defendants do not dispute this. Instead, Defendants argue that the FLSA claim is deficient because it fails to specify when and where Defendants failed to pay Plaintiffs the minimum wage. Again, this argument fails. There is no rule of pleading that requires such a level of specificity; Rule 8 certainly does not. The allegation

that Plaintiffs were working for Defendants in New York as recently as April 22, 2015, supports

the inference that FLSA violations occurred in New York within three years of the filing of this

case.[2] Indeed, Cabilocan only worked for Defendants in New York, and only during 2015.

Again, if Defendants want to deny liability for conduct that occurred in Qatar vis-à-vis

Sulaiman, or conduct that occurred outside the applicable statute of limitations, then they are

perfectly free to do so. But as long as the Complaint plausibly alleges some violation of the

FLSA in the United States within the statute of limitations, the Complaint cannot be dismissed

for failure to state a claim.

The same purported "defect" in pleading is the basis for Defendants' equally meritless

motion to dismiss the wage-and-hour claims under the NYLL. For the same reason Defendants'

attack on the FLSA claim fails, the Defendants' motion to dismiss the NYLL claims is denied.

### D.  The Motion to Dismiss Plaintiffs' Breach-of-Contract Claim Is Denied

To state a claim for breach of contract, a complaint must allege: 1) the existence of a

contract; 2) adequate performance of the contract by the plaintiff; 3) breach of the contract by the

defendant; and 4) damages caused by the breach. *Benihana of Tokyo, LLC v. Angelo, Gordon &*

*Co., L.P.*, No. 16 Civ. 3800, 2017 WL 933111, at *13 (S.D.N.Y. Mar. 8, 2017).

Plaintiffs allege the existence of contracts, their own adequate performance, breaches by

Defendants, and damages resulting from the breach. (Compl. ¶¶ 106–113.) The Complaint

contains plenty of factual allegations to support the allegations. Defendants apparently concede

this. They argue, however, that the claim must be re-pleaded to specify each contract allegedly

breached, the terms that were breached, and when and where each contract was signed. (Def.'s

Mem. at 12–13, Dkt. No. 16.)

---

[2] As stated above, willful violations of the FLSA's minimum wage provisions have a three-year statute of
limitations. In view of the Complaint's allegations, Plaintiffs presumably will argue that Defendants willfully
violated the FLSA.

Again, counsel should know better than to raise such a frivolous argument. The Defendants signed written contracts with Plaintiffs in order to get them U.S. work visas. (*See* Compl. ¶¶ 15, 25, 26, 33.). The existence of these contracts – which conform to U.S. legal requirements for foreign workers – is more than adequately pleaded, as is their breach.

### E. The Motion to Dismiss Plaintiffs' Claim for Unjust Enrichment and Quantum Meruit Is Denied

Under New York law, quantum meruit and unjust enrichment are quasi-contract claims. "Plaintiffs may only bring quasi-contractual claims in addition to a breach of contract claim 'where there is a dispute over the existence, scope, or enforceability on the putative contract.'" *CUnet, LLC v. Quad Partners, LLC*, No. 16 Civ. 6327, 2017 WL 945937, at *7 (S.D.N.Y. Mar. 7, 2017) (quoting *Harrison v. Toptani Law Offices*, No. 11 Civ. 6801, 2012 WL 694755, at *2 (S.D.N.Y. Mar. 2, 2012). To recover in quantum meruit, a plaintiff must establish: "1) the performance of services in good faith, 2) the acceptance of the services by the person to whom they are rendered, 3) an expectation of compensation therefor, and 4) the reasonable value of the services." *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 509 (2d Cir. 2009) (citation omitted). Similarly, a plaintiff may recover for unjust enrichment after establishing "that the defendant was enriched at the plaintiff's expense and that equity and good conscience require the plaintiff to recover the enrichment from the defendant." *Bigio v. Coca-Cola Co.*, 675 F.3d 163, 176–77 (2d Cir. 2012) (citation omitted). "Under New York law, quantum meruit and unjust enrichment may be jointly analyzed as a single quasi-contract claim." *Rapay v. Chernov*, No. 16 Civ. 4910, 2017 WL 892372, at *5 (S.D.N.Y. Mar. 6, 2017).

The Complaint alleges that Plaintiffs "performed significant work for Defendants that was outside the scope of Plaintiffs' valid and binding employment contract. This additional and unanticipated work included caring for children and preparing meals." (Compl. ¶ 115.) It further

alleges that: "Defendants instructed, supervised, accepted, and retained the benefit of Plaintiffs' services" (*Id.* ¶ 117); that Plaintiffs "performed these services with the reasonable expectation that they would be compensated adequately for their services at the time they were performed" (*Id.* ¶ 118); and that "Defendants failed adequately to compensate [Plaintiffs] for this work" (*Id.* ¶ 119). Thus, the claim is more than adequately pleaded. It will not be dismissed at this juncture. If it becomes clear, after discovery, that the claim is duplicative, the issue may be readdressed.

### F.  The Motion to Dismiss Plaintiffs' Claim for Common Law Fraud Is Granted

To state a claim for common law fraud, a plaintiff must allege that: "1) the defendant made a material false representation, 2) the defendant intended to defraud the plaintiff thereby, 3) the plaintiff reasonably relied upon the representation, and 4) the plaintiff suffered damage as a result of such reliance." *Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank*, 57 F.3d 146, 153 (2d Cir. 1995). In New York, a fraud claim must be dismissed when it "arises out of the same facts as plaintiff's breach of contract claim, with the addition only of an allegation that defendant never intended to perform the precise promises spelled out in the contract between the parties." *Telecom Int'l Am. Ltd. v. AT&T Corp.*, 280 F.3d 175, 196 (2d Cir. 2001).

Plaintiffs allege that the terms of their employment contracts were material false representations made by Defendants. (Compl. ¶¶ 125–127.) That may well be true, but it is of no moment. Nothing distinguishes this claim from the claim for breach of contract, apart from Plaintiffs' allegation that the contract terms were "false promises." (*See* Def.'s Reply at 4, Dkt. No. 18.) The fraud claim is the breach-of-contract claim dressed in a different outfit, and so it must be dismissed.

Plaintiffs try to save the claim by arguing that the instant facts are analogous to those in *Lipenga v. Kambalame*, No. GJH–14–3980, 2016 WL 6662252 (D. Md. Nov. 9, 2016) and *Rana*

*v. Islam*, 305 F.R.D. 53 (S.D.N.Y. 2015) – cases in which both fraud and breach-of-contract claims were sustained. But this ignores a crucial distinction between those cases and the one at bar. In *Lipenga*, the alleged material false representations were not the contract's terms, but rather, statements made to induce the plaintiff to sign the contract. *See Lipenga*, 2016 WL 6662252, at *7. Similarly, in *Rana*, the defendant made the alleged false statements "in the course of the parties' negotiation over the terms of [the plaintiff's] employment." *Rana*, 305 F.R.D. at 62. The instant Complaint contains no similar allegation. It pleads facts consistent with the commission of a fraud on the United States (the submission of contracts Defendants had no intention of honoring), but not a fraud on Plaintiffs.

### G.  The Motion to Dismiss Plaintiffs' Claim for Conversion Is Denied

The Complaint alleges that it was Defendants' usual practice to confiscate Plaintiffs' passports immediately upon their arrival in the United States, thereby interfering with Plaintiffs' ability to use the passports. Nothing more is required to state a claim for conversion. *See Parlin Funds LLC v. Gilliams*, No. 11 Civ. 2534, 2011 WL 7004193, at *11 (S.D.N.Y. Nov. 28, 2011) ("The complaint alleges that plaintiffs had ownership of the funds and that [the defendant] arranged to misappropriate them, thus interfering with plaintiffs' ability to control those funds. Nothing more is required to assert a conversion claim . . . .").

### H.  The Motion to Dismiss the Claim for IIED Is Granted

In New York, the statute of limitations for IIED is one year. *Wolff v. City of N.Y. Fin. Srvs. Agency (FISA)*, 939 F. Supp. 258, 263 (S.D.N.Y. 1996) (citing N.Y. C.P.L.R. § 215(3)). Plaintiffs brought this action on October 19, 2016. Defendants argue that the IIED claim is time-barred because Plaintiffs escaped from Defendants' apartment on April 22, 2015, meaning

Defendants could not have engaged in actionable behavior within one year of this action being filed. The Court agrees.

Plaintiffs argue that their IIED claim was timely filed because Defendants' calls to Cabilocan's family, which were made at some unspecified time after April 22, 2015, constituted "continuous tortious conduct" sufficient to toll the statute of limitations. There are three reasons why this argument fails.

First, Plaintiffs have not plausibly alleged that Defendants committed any action at all, including making any telephone call to Cabilocan's relatives, after October 19, 2015. It is not enough for Plaintiffs to say in their motion papers (not in their pleading) that phone calls were made after they escaped from Defendants' apartment – which was six months before the beginning of the limitations period for IIED. While the alleged phone calls occurred after the escape, the plausible inference that can be drawn from the pleading as filed is that they occurred relatively soon after the women escaped – not over six months later.

Second, while the making of threatening phone calls is certainly despicable, it is, sadly, behavior in which even civilized people occasionally engage. But IIED is "highly disfavored under New York law" (*Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 158 (2d Cir. 2014)), and will only lie when the alleged conduct is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as so atrocious, and utterly intolerable in a civilized society." *Wolff*, 939 F. Supp. at 263 (internal quotations omitted). The making of threatening phone calls to third parties, demanding to know the whereabouts of vanished employees and threatening them with deportation once they are found, does not rise to that level.

Finally, the phone calls were discrete actions that were separate and apart from the course of conduct of mistreatment of the two women. Therefore, the "continuing violation" doctrine – another disfavored rule that is applied in rare circumstances (*see, e.g., Gaffney v. Vill. of Mamaroneck Police Dep't*, No. 15 Civ. 5290, 2016 WL 4547499, at *5 (S.D.N.Y. Aug. 31, 2016)) – would not apply to bring the utterly egregious misconduct allegedly committed more than a year prior to the filing of this lawsuit within the ambit of a timely IIED claim. The phone calls would be more akin to the discrete actions that do not extend the statute of limitations in cases like *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).

## I.   The Motion to Dismiss Plaintiffs' Claim for NIED Is Granted

To state a claim for NIED, a plaintiff must allege: 1) that the defendant owed her a duty; 2) that the defendant breached the duty; 3) and that the plaintiff suffered an emotional injury as a result. *Fisk v. Letterman*, 424 F. Supp. 2d 670, 676 (S.D.N.Y. 2006). Furthermore, "the defendant's conduct must have unreasonably endangered the plaintiff's physical safety." *Id.* "The duty in such cases must be specific to the plaintiff, and not some amorphous, free-floating duty to society." *Kraft v. City of New York*, 696 F. Supp. 2d 403, 424 (S.D.N.Y. 2010) (quoting *Mortise v. United States*, 102 F.3d 693, 696 (2d Cir. 1996).

The allegations set forth in the Complaint do not support plausibly the inference that Plaintiffs suffered mistreatment as a result of Defendants' negligence. On the contrary, they support the inference that Defendants *deliberately* mistreated Plaintiffs. For this reason, the claim for NIED is dismissed.

## II.   Defendants' Motion for a More Definite Statement Is Denied

Rule 12(e) provides that, "A party may move for a more definite statement of a pleading to which responsive pleading is allowed but which is so vague or ambiguous that the party

cannot reasonably prepare a response." Fed. R. Civ. P. 12(e); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002) ("If a pleading fails to specify the allegations in a manner that provides sufficient notice, a defendant can move for a more definite statement under Rule 12(e) before responding."). Such a motion "must point out the defects complained of and the details desired." *Id.*

"A Rule 12(e) motion is not granted lightly. In view of Rule 8(a)'s liberal pleading requirements, and the availability of discovery to provide additional factual detail for the parties' claims, motions under Rule 12(e) are generally disfavored because of their dilatory effect." *Joya v. Verizon N.Y., Inc.*, No. 08 Civ. 5328, 2008 WL 4667987, at *1 (S.D.N.Y. Oct. 20, 2008). "Rule 12(e) is designed to remedy unintelligible pleadings, not merely to correct for lack of detail." *Kelly v. L.L. Cool J.*, 145 F.R.D. 32, 35 (S.D.N.Y. 1992). Thus, "a motion for a more definite statement should not be granted 'unless the complaint is so excessively vague and ambiguous as to be unintelligible and as to prejudice the defendant seriously in attempting to answer it.'" *Joya*, 2008 WL 4667987, at *1 (quoting *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, No. 00 Civ. 1898, 2005 WL 1500893, at *2 (S.D.N.Y. June 24, 2005)).

In light of this standard, Defendants' motion for a more definite statement clearly borders on the frivolous. The Complaint more than adequately alleges its claims and the facts that support them. If Defendants want more details, they will not get them on a Rule 12(e) motion. Rather, they can try to get them through discovery. That is the way we do it in the federal courts.

### III.   Defendants' Motion to Strike Is Denied

Under Rule 12(f), the Court "may strike from the pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Motions to strike "are not favored and will not be granted unless it is clear that the allegations in question can have no possible bearing on the subject matter of the litigation." *Lennon v. Seaman*, 63 F.

Supp. 2d 428, 446 (S.D.N.Y. 1999). Furthermore, "the movant should show that he will be prejudiced if the attacked allegations are left in the pleadings." *Williams v. Rosenblatt Sec. Inc.*, 136 F. Supp. 3d 593, 615 (S.D.N.Y. 2015).

There is no such matter in the Complaint. If Plaintiffs set forth "scandalous" allegations in their complaint, it is because they contend that Defendants engaged in truly scandalous behavior. The "scandalous" allegations are intrinsic to and have great bearing on the subject matter of this lawsuit. The only thing impertinent here is Defendants' motion to strike. It is denied.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is granted as to Plaintiffs' claims for common law fraud, IIED, and NIED. In every other respect, Defendants' motion is denied.

The Clerk is instructed to remove the motion at Docket No. 15 from the Court's list of pending motions.

Dated: April 4, 2017

U.S.D.J.

BY ECF TO ALL COUNSEL